Marino PERPIGNANI, Plaintiff-Respondent-Petitioner,

v.

Thomas VONASEK, as Personal Representative of the Estate of Bernt S. Brekke, Deceased, and Helen C. Brekke, Defendants and Third-Party Plaintiffs-Respondents,

David A. PIEPER and Arleen J. Pieper, his wife, Third-Party Defendants-Appellants,

Helen RASMUSSEN, Third-Party Defendant-Co-Appellant,

WASHBURN COUNTY ABSTRACT COMPANY, Third-Party Defendant.

Supreme Court

*No. 84–2445. Argued April 28, 1987.—Decided June 17, 1987.*

(Also reported in 408 N.W.2d 1.)

695

For the plaintiff-respondent-petitioner there were briefs by *Edward J. Coe,* and *Coe, Dalrymple, Heathman & Coe, S.C.,* Rice Lake and oral argument by *Edward J. Coe.*

For the third-party defendant-appellant there was a brief by *Joe Thrasher,* and *Weisel, Thrasher, Doyle & Pelish, Ltd.,* Rice Lake, and oral argument by *Joe Thrasher.*

For the third-party defendant-co-appellant there was a brief by *Hugh H. Gwin,* and *Gwin & Gwin,* Hudson and oral argument by *Hugh H. Gwin.*

DAY, J.  This is a review of a decision of the court of appeals, *Perpignani v. Vonasek,* 129 Wis. 2d

478, 386 N.W.2d 59 (Ct. App. 1986), reversing a judgment of the circuit court for Washburn county, Hon. Harry F. Gundersen, awarding ownership of a portion of land along the shore of Shell Lake to Marino Perpignani, (Plaintiff) and rejecting a claim of adverse possession under color of title to such land.

The issues presented are: 1) Does a deed conveying a part of Government Lot 2 by a metes and bounds description constitute color of title to land, under the terms of sec. 893.06, Stats. (1971),[1] which is, through a court-approved reliction apportionment, determined to be part of adjoining Government Lot 3?; 2) Did the Defendants-Respondents Brekke establish continued adverse possession, for the requisite time period, under sec. 893.07,[2] of any land whose ownership is

---

[1]Section 893.06, Stats., (1971), provides:

"**893.06 Presumption of adverse holding under conveyance or judgment.** Where the occupant or those under whom he claims entered into the possession of any premises under claim of title, exclusive of any other right, founding such claim upon some written instrument, as being a conveyance of the premises in question, or upon the judgment of some competent court, and that there has been a continual occupation and possession of the premises included in such instrument or judgment or of some part of such premises under such claim for 10 years, the premises so included shall be deemed to have been held adversely; except that when the premises so included consist of a tract divided into lots the possession of one lot shall not be deemed the possession of any other lot of the same tract."

[2]Section 893.07, Stats., (1971), provides:

"**893.07 Adverse possession defined.** For the purpose of constituting an adverse possession by any person claiming a title founded upon some written instrument or some judgment land shall be deemed to have been possessed and occupied in the following cases:

"(1) Where it has been usually cultivated or improved;

699

subject to dispute in this case?; 3) May the court award title by adverse possession under color of title when the claimant acquires such land less than ten years prior to commencement of an action adjudicating rights to the property?; 4) If the court determines that "tacking" is available, has it been shown that the prior owner of one of the Brekke parcels adversely possessed the land under sec. 893.07, Stats., (1971), so that the combined sum of adverse possession would meet the required statutory period of ten years?

There are two deeds involved in the instant case: 1) The first is a 1960 conveyance from Third-Party Defendants, David A. and Arleen J. Pieper, to Defendant Helen C. Brekke and Bernt Brekke. We determine the color of title question with regard to this deed; 2) The second deed is a 1972 conveyance from Third-Party Defendant, Helen Rasmussen, also to the Brekkes. The ownership of land within the parcels conveyed and described in the foregoing two deeds is in dispute.

We conclude that the 1960 Pieper deed clearly establishes color of title under sec. 893.06, Stats., (1971). This conveyance adequately describes the land which the Brekkes have occupied since that time. Ambiguity arises *only* when the metes and bounds

"(2) Where it has been protected by a substantial inclosure;

"(3) Where, although not inclosed, it has been used for the supply of fuel or of fencing timber for the purpose of husbandry or for the ordinary use of the occupant;

"(4) Where a known farm or a single lot has been partly improved the portion of such farm or lot that may have been left not cleared or not inclosed, according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the party improved or cultivated."

description is viewed in tandem with the 1984 trial court determination that reliction apportionment required adjustment of the government lot lines. In determining whether there has been adverse possession, the court is concerned only with the period of time prior to commencement of the action. During this period there is no question as to the meaning of the description.

We conclude that, as to the parcel of land conveyed in the 1960 Pieper deed, the Brekkes have established all statutory elements of adverse possession under secs. 893.06 and 893.07, Stats., (1971). As to this parcel, we affirm the court of appeals' decision and award possession to the Brekkes.

As to the parcel conveyed in the 1972 Rasmussen deed, we conclude that the doctrine of "tacking" is available here. However, the Brekkes cannot establish the required ten years of continuous adverse possession as to this parcel. We are persuaded that evidence of the nature of the Rasmussen's ownership is insufficient to establish ownership by adverse possession and that portion of the Rasmussen parcel west of the court approved reliction line belongs to Plaintiff. We remand to the trial court in order that evidence may be entered on the value of the parcel. We direct that the parties be allowed to introduce expert testimony on the subject.

The facts essential to resolving this case are as follows: There are two lots of land which border the south side of a bay area of Shell Lake in Washburn county. These lots are adjacent to one another. The west lot is Government Lot 3; the east lot is Government Lot 2.

Government Lot 3 is owned by Plaintiff. Plaintiff also owns the south twenty acres of Government Lot 2.

The lakeside or northern portion of Government Lot 2 is owned by Defendant Helen C. Brekke (Brekkes).[3] The Brekkes acquired their land through two conveyances. The western portion was conveyed by deed from the Third-Party Defendants, David A. Pieper and Arleen J. Pieper (Piepers).[4] This deed was dated December 5, 1960, and recorded September 16, 1960. The eastern parcel was conveyed by deed from Third-Party Defendant, Helen Rasmussen (Rasmussen).[5] The latter deed was dated September 1, 1972 and recorded September 11, 1972.

As noted, both Lots 2 and 3 are bordered on the north by Shell Lake. As is customary, a "meander line"[6] had been established to approximate the shoreline of the lake for surveying purposes. The dispute in this case concerns ownership of land lying at the lot line between Lot 3 and Lot 2, and more specifically,

---

[3]Thomas Vonasek is also denominated a Defendant. Mr. Vonasek is the Personal Representative of Bernt Brekke's estate. Bernt Brekke and Helen Brekke were husband and wife. For convenience, we will refer to Defendants as the Brekkes.

[4]In their brief to this court, the Piepers have noted that they are the "actual Appellants." The Piepers state that "[b]y virtue of their warranty deed, the Piepers essentially stand in Brekke's shoes."

[5]The eastern parcel was conveyed by Helen Rasmussen and her husband, who is deceased.

[6]"The traverse of the margin of a permanent natural body of water is termed a meander line....The general rule is that meander lines are run not as boundaries, but to define the sinuosities of the banks of the stream or other body of water, and as a means of ascertaining the quantity of land embraced in the survey; the stream, or other body of water, and not the meander line as actually run on the ground, is the boundary." U.S. Dept. of Interior, Bureau of Land Management, *Manual of Instructions For Survey of the Public Lands of the United States*, sec. 3–115 (1973).

land lying between the meander line and the actual shoreline of the lake.[7]

Property disputes typically arise when some occurrence brings to light questions concerning ownership. The precipitating event in the instant case was Plaintiff's re-survey of his land. In the spring of 1980, the Plaintiff hired a surveyor to monument the boundaries of his land. In the course of his work, Plaintiff's surveyor noted that the level of Shell Lake had dropped. When the water level of a lake drops, exposing land, "reliction"[8] is said to have taken place.

The presence of relicted land is important in the present case because of the effect relicted land may have on determining property boundaries. When reliction takes place, the new, exposed land should be apportioned in an equitable manner amongst property owners on the lake.[9] There are various methods employed by surveyors in apportioning relicted land.[10]

---

[7]As discussed later in the opinion, the location of the original government meander line is unclear. Two surveyors who performed surveys in association with the instant case attempted reconstructing a meander line, apparently relying on field notes from the original survey.

[8]"'Reliction is the gradual uncovering of land caused by the recession of a body of water.'" *Manual of Instructions*, sec. 7–63.

[9]In discussing various methods of apportioning an accretion or a reliction, this court has stated:

"Although different rules may apply to situations falling into substantially different types ... in any situation a given rule is not to be strictly applied so as to produce an inequitable result because of particular circumstances...." *Rondesvedt v. Running*, 19 Wis. 2d 614, 618, 121 N.W.2d 1 (1963).

[10]"Relicted land is treated in the same manner as accreted land insofar as its survey is concerned." *Manual of Instructions*, sec. 7–63 (1973). The Government Manual states that apportion-

Plaintiff's surveyor proceeded to accommodate for the relicted land and to fix a new division line between Lot 3 and Lot 2. It has been Plaintiff's argument throughout that his surveyor used the "straight-line" method and apportioned the relicted land.[11]

Government Lots 2 and 3 are divided, from their southern boundary to the Government meander line, by a straight line which runs North/South. In using the "straight line" method, the Plaintiff's surveyor simply extended the property division line, in a

---

ment of accreted lands is usually made by proportioning the new frontage in the same ratio as the frontage along the old shore. *Id.* at sec. 7–66.

Wisconsin has employed this "equal proportion" or "equal ratio" rule. In *Hathaway v. Milwaukee,* 132 Wis. 249, 251, 111 N.W. 570, 112 N.W. 455 (1907), this Court found "proper" and "well-recognized" the rule of apportionment which apportioned "to each abutting proprietor such proportion of the new shore line as his ownership of the original shore line bore to the whole line on which the accretion abuts. . . ."

Both the surveyors who testified at trial stated that there are several methods which may be used to apportion relicted lands. Though there may be an agreed goal to achieve an "equal ratio," the method of division used to accomplish this will vary with the circumstances.

[11]The "straight line" method is often referred to in Wisconsin as the "*Jansky* rule." In *Jansky v. Two Rivers,* 227 Wis. 228, 240, 278 N.W. 527 (1938), this Court stated that, in apportioning an accretion or reliction, "the new division lines must be drawn in a straight line, at a right angle to the present shore line, from the points at which the division lines of coterminous owners intersected the original shore line."

Plaintiff's Surveyor, Phillip Lysdahl, testified that he determined the location of the line between Government Lot 3 and Government Lot 2 by "prolongation of the protracted government lot line of the original survey."

straight line, from the meander line north to the actual shoreline. The problem with this method, from the Brekkes' perspective, is that they were occupying the land to the west of the surveyor's proposed boundary line—land which arguably was owned not by the Brekkes, but by the Plaintiff.

Excerpt from Exhibit 16

DIAGRAM 1

An excerpt from Exhibit 16 illustrates the significance of the new division line proposed by Plaintiff's surveyor:

705

Line D represents the reliction line drawn by Plaintiff's surveyor. The diagram reveals that, should line D be determined the division line between Government Lots 2 and 3, the Brekkes' house and a small part of their garage encroach on Lot 3.

The enclosed box in the diagram, bordered on the west by Line B and east by Line C, represents the parcel conveyed to the Brekkes in the 1960 Pieper deed. Property conveyed by the 1972 Rasmussen deed is East of Line C. It will be noted that the majority of the disputed land (west of Line D) falls under the Pieper deed, while only a small triangle abutting the shoreline is the subject of the Rasmussen deed. Line A represents the reliction line as drawn by Defendants' surveyor using the "pie" or "cove" method.[12] It is apparent that, employing Defendant surveyor's method, there is no encroachment upon Plaintiff's property, Plaintiff's property all lying west of line A and the house and garage to the east of line A.

Reasoning that the Defendant was encroaching upon his property, Plaintiff filed suit on September 9,

---

[12]Defendants' Surveyor, Steven Johnson, testified that he used the "center of the bay" method to determine the reliction line. The following exchange took place at trial:

"Q:  What method did you use, would you tell the court, please?

"A:  I used the center of the bay at the end point of a line and I connected that end point with the intersection of where I determined the original government meander line to be, where the original government meander line intersected the government lot line between Government Lots 2 and 3, and I drew a straight line between those.

"Q:  You drew a straight line between what?

"A:  Between the center of the bay as I determined it and the point on the meander line where the North-South government lot line intersected the meander line."

1980, seeking a declaration of interest in the property. Plaintiff sought judgment awarding him immediate possession of the property, requiring the Brekkes to remove all structures or encroachments, and $10,000 in damages.

On November 20, 1980, the Brekkes filed a third-party complaint against the Piepers, Helen Rasmussen, and Washburn County Abstract Company. The Brekkes sought to tender the defense of the principal action brought by Plaintiff to these Third-Party Defendants, asking that they be liable for any damages and costs arising out of the principal action. The theory of the third-party complaint was that the warranty deeds provided that the Third-Party Defendants "would warrant and defend said title against any and all persons claiming any adverse interest herein." The Brekkes contended that they had been deeded the property which was the subject of dispute and that the adverse interest claim was properly handled by the grantors and the abstract company, based on what had been warranted.

The Brekkes also filed an answer to Plaintiff's complaint, pleading several affirmative defenses. The chief affirmative defense was the assertion that the Brekkes own the property by virtue of adverse possession. The Brekkes also pled affirmative defenses of acquiescence and estoppel.

The case was tried in circuit court on April 28, 1983. The trial court issued a memorandum opinion on January 19, 1984. The trial court stated: "The basic issue here is whether or not the relicted land in question should be divided by extending the original government survey line in a straight line to the now existing high watermark or by using the pie or bay method in such apportioning." The trial court went on

to find that "the reliction should be divided by extending the original government survey line between Government Lots 2 and 3 in a straight line to the ordinary high watermark now existing."

The trial court rejected the Brekkes' arguments based on adverse possession. As to the claim based on the twenty year statute, the trial court noted:

> "There is no evidence that defendants made any claim prior to the recording of either of these two deeds [the warranty deeds from the Piepers, September 1960, and Rasmussens, September 1972] and therefore can make no claim based upon their usage of the property. The only evidence on the record of such a usage by the defendant prior to the recording of Brekke's deeds is simply that the property was not used for the pasturing of cattle."

The trial court also addressed the adverse possession argument based on the ten-year "color of title" statute, sec. 893.26, Stats.:[13]

> "As to the 10 years color of title argument under Sec. 893.26, the claimant must have a recorded deed which described the land in question. Plaintiff's land, of course, is in Government Lot 3 and Brekke's land is entirely within Government Lot 2. If the land claimed by defendant is in fact land belonging to plaintiff it is located in Government

---

[13]As correctly pointed out by the court of appeals, "[t]he statutes governing the adverse possession claim are those in existence at the time the claim accrued, secs. 893.06 and 893.07, Stats., (1971)." *Perpignani,* 129 Wis. 2d at 485.

Section 893.26, Stats., applied by the trial court, requires a filing of the deed within thirty days. Brekke had not done this with respect to the Pieper deed. The applicable statutes, however, had no such filing requirement.

Lot 3 and defendants deeds do not describe any land in Government Lot 3 and therefore cannot constitute color of title under the statute. *Beasley vs. Konczal,* 87 Wis. 2d 233, 275 N.W.2d 634 (1979). Further, it is clear that plaintiff had no constructive notice from the records in the office of the Register of Deeds that any claim was being made by defendants to any part of Government Lot 3."

The trial court found that the buildings constructed by the Defendant encroached on the Plaintiff's property and that Plaintiff should be awarded damages for such encroachment. Rather than requiring removal of the structures, the trial court specified that the Plaintiff would be compensated for the value of the land. Based on Plaintiff's testimony that the lakeshore property had a fair market value of $250 a foot, the trial court determined that Plaintiff should be paid $11,250 as compensation. The Trial Court also awarded survey costs and actual costs to the Plaintiff.

The trial court subsequently filed Findings of Fact and Conclusions of Law (filed October 24, 1984), as well as a Judgment and Notice of Entry of Judgment (both filed November 2, 1984). These documents conform to the trial court's memorandum opinion.

The Defendant and Third-Party Defendants filed their appeals from the whole of the judgment.

The court of appeals concluded that the trial court "did not abuse its discretion in its choice of survey methods," *Perpignani,* 129 Wis. 2d at 480, and "properly apportioned the reliction." *Id.* at 483. The court of appeals noted that different methods may apply "for establishing the extension of boundaries between contiguous shoreline properties," that the method chosen varies with the circumstances, but

that courts "are obliged to avoid inequitable results when apportioning relicted lands." *Id.*

The court of appeals identified two methods of apportionment as potentially applicable here: the "straight-line" method and the "pie" or "cove" method. Under the court of appeals' conception, the significance of this choice in method is that, using the straight-line method, the Defendant's house and part of his garage encroaches on the Plaintiff's land. Conversely, there is no encroachment if the pie or cove methods are used. Plaintiff advocates use of the straight-line method.

The court of appeals reviewed the testimony of the two surveyors who testified at trial, Plaintiff's surveyor, Phillip Lysdahl, who employed the "straight-line" method, and Defendants' surveyor, Steven Johnson, who advocated the pie method. The court of appeals found that there was no abuse of discretion in the trial court's choice of the straight-line method, stating:

> "In the absence of a showing that the pie method is the only one recognized in surveying practice and is the only result possible, it is within the province of the trial court to determine the weight and credibility of these two expert witnesses and to choose which method to follow. *See, Rosen v. DILHR*, 267 Wis. 220, 225, 64 N.W.2d 845, 847 (1954)."

The court of appeals then treated Brekkes' claim of adverse possession under color of title. The Court first determined that the applicable adverse possession statutes are secs. 893.06 and 893.07, Stats. (1971). 129 Wis. 2d at 485. The court of appeals criticized the trial court's finding of an "absence of color of title,"

710

noting that the trial court's analysis was faulty. *Id.* at 486.

The trial court concluded that, despite the fact that the metes and bounds description in the deed from the Third-Party Defendants to Defendant accurately described the land Defendant has occupied since 1960, the description was premised with the phrase "that part of Government Lot Two (2)." Since the straight-line reapportionment meant that the land upon which the Brekkes' house sits is in Lot 3, the deed does not properly describe the land in question and there is no color of title.

The court of appeals rejected the trial court's conclusion, and found that there was color of title:

> "It is undisputed that the deed accurately, by metes and bounds, describes the lot that Brekke has occupied since 1960. The reference in the deed to Lot 2 does not poison the otherwise accurate description. The fact that Brekke's lot was only later judicially decreed to be part of Government Lot 3, and not Lot 2, is the defect causing the deed to pass only color of title and not actual title." *Id.* at 487.

The court of appeals reasoned that the effect of concluding that color of title existed was to reverse the normal presumption rule attending an adverse possession claim, i.e., that all reasonable presumptions should be made in favor of the true owner against the adverse claimant. Relying on *Illinois Steel Co. v. Budzisz,* 139 Wis. 281, 119 N.W. 935 (1909), the court of appeals concluded: "Because Brekke had color of title, the rebuttal [sic] presumptions and burdens normally favorable to Perpignani, the true owner, therefore shift to favor Brekke, the adverse claimant."

129 Wis. 2d at 488. The trial court was criticized for not considering "this shift in the burden of proof or rebuttable presumptions." *Id.*

Analyzing the evidence related to possession of the land, the court of appeals held that the trial court's finding that the Defendant did not hold the land in an open, notorious, and hostile manner was "clearly erroneous," citing sec. 805.17(2), Stats. The court of appeals stated:

> "The trial court's failure to recognize the Brekkes' color of title, failure to allocate the burden of proof to Perpignani, and its clearly erroneous findings as to adverse possession resulted in an erroneous conclusion of law rejecting the Brekkes' claim of adverse possession under color of title." *Id.* at 490.

The court of appeals reversed the judgment and remanded in order to grant Helen Brekke adverse possession to the land in question. The Plaintiff filed a petition for review on March 26, 1986 and the petition was granted on July 25, 1986.

The parties have sought review on issues related to adverse possession, and not the issue of the correctness of the method chosen to apportion the relicted land. In analyzing the latter issue, the court of appeals treated the matter on review as a question of whether the trial court had abused its discretion in its choice of methods. This court does not ordinarily address such matters as a discretionary decision by the trial court, once such decision has been reviewed by the court of appeals, provided it is based upon a proper view of the law. *See, State v. McConnohie,* 113 Wis. 2d 362, 368–369, 334 N.W.2d 903 (1983). However,

in the instant case, important issues of law are implicated in the reliction issue.

We start by reiterating the fundamental principle that the purpose of the line-drawing that goes along with reliction is to equitably divide the *relicted* land. Wisconsin case law has consistently held that the two points or lines necessary to apportion relicted land are the original shoreline and the new shoreline. *See, e.g., Hathaway v. Milwaukee*, 132 Wis. 249, 111 N.W. 570 (1970); *Jansky v. Two Rivers*, 227 Wis. 228, 278 N.W. 527 (1938); *Rondesvedt v. Running*, 19 Wis. 2d 614, 121 N.W.2d 1 (1963); *DeSimone v. Kramer*, 77 Wis. 2d 188, 252 N.W.2d 653 (1977).

The two surveyors in the instant case each employed their apportionment method using a reconstructed government meander line, instead of the original shoreline. Their resulting "division lines" thus affected the location of the boundary between Lots 2 and 3 and thus purported to determine property rights as to property which was not created by reliction.

At trial, counsel for Defendant, Washburn Abstract, stated her objections to the method of apportionment urged by Plaintiff and moved the trial court to dismiss the case after Plaintiff's surveyor had testified. Counsel argued to the trial court:

> "The plaintiff has shown in no way that the surveyor has used the proper rule for reliction in this matter. There is no basis for his contention, in Wisconsin at least, that the proper means of apportioning reliction is by simply extending government lot lines. It is clear from the cases that we are not talking about where government lot lines are, but rather how the property or real estate

which results from the recession of lakeshore is apportioned among the lakeshore owners. That is the real question."

The trial court, apparently relying on *Nosek v. Stryker,* 103 Wis. 2d 633, 309 N.W.2d 868 (Ct. App. 1981), denied the motion, stating that there was more than one way to apportion a reliction.

In *Nosek,* the court of appeals dealt with a dispute between two neighbors owning adjacent land on a lake, one claiming the other's pier encroached upon his waterfront rights. The court of appeals stated: "There is no set rule in Wisconsin for establishing the extension of boundaries into a lake between contiguous shoreline properties." 103 Wis. 2d at 635. The court of appeals went on to discuss three general methods which have surfaced in Wisconsin case law.

The court of appeals, in the instant case, relied on *Nosek* for the proposition that several rules apply "for establishing the extension of boundaries between contiguous shoreline properties." 129 Wis. 2d at 483. In a footnote to the foregoing statement, the court of appeals added: "The various cases reveal that these rules apply generally to cases apportioning land along a body of water, whether the specific situation is a reliction, accretion, or extension of boundaries into a lake. *Id.* at 483, n. 5.

In a very general way, methods employed in cases involving reliction and accretion, and extending boundaries into a lake are similar. In any particular case, however, it is important to keep in mind the purposes of any line-drawing.

One of the cases cited by the court of appeals supporting the proposition that the methods in the various cases are similar is *Northern Pine Land Co. v.*

*Bigelow,* 84 Wis. 157, 54 N.W. 496 (1893). In *Northern Pine,* the Court reviewed a determination of the trial court as to a boundary line between adjacent riparian owners extending into a bay, from the shoreline to the line of navigable water. The court stated that "[w]here the general course of the shore is a straight line, or approximates a straight line, and the division lines between coterminous riparian owners are at right angles with the shore, there would seem to be no difficulty in reaching the navigable water by straight parallel lines. . . ." 84 Wis. at 164. The court understood this method to reflect the "general rule." *Id.* at 164–165.

The *Northern Pine* court pointed out, however, that the trial court, in the case before it, had deviated from the general rule:

> "In the case at bar the trial court apparently attempted to follow the general rule indicated, but erroneously, as we think, took the meander line, as located by the government survey, as the shoreline of the bay. This court has frequently held, in effect, that such meander lines, so located, are not to be considered in determining the actual boundaries of lots sold by the government as bordered upon rivers or other navigable waters, nor for determining the respective rights of coterminous riparian owners of lands fronting thereon." *Id.* at 166.

The purpose of the line-drawing in *Northern Pine* was to determine rights of adjacent riparian owners to reach navigable water. The division line constructed was drawn between the actual shoreline and the line of navigable water.

The purpose of the line drawing in the present case is to apportion relicted land, and not to determine

715

property rights as to land between the meander line and the original shoreline.[14] It is apparent that the trial court understood the purposes of the apportionment. The trial court was hampered, however, by the lack of accurate information concerning historical boundaries and watermarks. Findings of fact eleven and twelve, made by the trial court, provide:

> "11. There is no evidence as to the ordinary high watermark of Shell Lake at the time of the original Government survey; the meander line as shown on the original Government survey does not mark the ordinary high water line of Shell Lake at the time of the original Government survey.

> "12. It is likely that some or all of the property claimed by Bernt S. Brekke and Helen C. Brekke constitutes relicted land however, it is not possible to determine the depth of the relicted land since it is not possible to locate the ordinary high watermark at the time of the original Government Survey around Shell Lake."

The testimony of the surveyors at trial further reveals the uncertainty regarding original boundaries and watermarks. Plaintiff's surveyor stated that the original survey did not contain a division line between Government Lots 2 and 3, between the meander line and the lake. He stated: "The original surveyors did not protract the interior subdivision lines of the section on the field. They established a meander line and ran the section lines and set the section corners

---

[14]The importance of distinguishing between the meander line and the actual shoreline for purposes of determining boundaries in cases involving property rights and bodies of water was recognized long ago by this Court. *The Menasha Wooden Ware Co. v. Lawson*, 70 Wis. 600, 36 N.W. 412 (1888).

and the quarter section corners and various meander corners." As to the original meander line, Plaintiff's surveyor testified: "The original government meander line is only identifiable by putting it on paper, making some assumptions. There is no monumentation." The surveyor created a "new meander line ... when [surveying] for Mr. Perpignani...."[15]

---

[15]Defendants' surveyor, Steven Johnson, also appears to have reconstructed the original meander line. Asked what he did in surveying the land, he responded:

> "I had to fit together the old government meander line to my survey due to the fact that was the only way I felt that I could approximate the shoreline in existance [sic] when the government lots were created in the mid 1850's."

The following then took place:

> "Q: Did you traverse or go over that entire line as you believed it to be at that time?
>
> "A: No, I did not follow that line. That was a mathematical line that was computed on paper."

Referring to Exhibit Twelve, the original township plat, he was asked:

> "Q: ... does it show the original meander line as laid out at that time by the orginal survey?
>
> "A: Yes."

Later, the following exchange occurred:

> "Q: And that meander line as established in the original government survey was always located back from the actual water's edge, wasn't it?
>
> "A: I don't know that for a fact, no.
>
> "Q: You don't know where it was located?
>
> "A: I know it was located in the proximity of the shoreline. ...
>
> "Q: As you ran your reconstruction of the original government meander line...."

Plaintiff's surveyor stated that he was not able to determine the location of the original shoreline. At trial, the following exchange occurred:

"Q: As far as your lakeshore frontage is concerned. You aren't able to make any determination from this original township plat, which is Exhibit 12, as to where the actual water or shoreline was at the time of this original sruvey [sic]?

"A: Where the actual water is, no."

Further review of Plaintiffs' Surveyor's testimony reveals that it is doubtful that he even intended to apportion the reliction. He stated:

"Q: And you did not make any attempt to apportion any diminution in lakeshore by virtue of the reliction of the lake in receding over the years, is that correct?

"A: I did not make any attempt to apportion the thing." Plaintiff's surveyor also testified:

"Q: In your survey of this property, did you ever attempt to apportion the new shoreline in relation to the old shoreline?

"A: Subsequently, after the fact, we tried some various apportionments.

"Q: You did not do it prior to the time that you prepared the Documents that are now in evidence?

---

Reference to Exhibit Twelve reveals that the meander lines were entered in charts, notating points of reference, courses, and distances in chains and links. The surveyors appear to have referenced these notations in reconstructing the government meander line.

"A: They were considered, but they were not used.

"Q: So your diagram, that's been admitted into evidence, does not use that proportional formula?

"A: No, it does not."

It is apparent that Plaintiff's surveyor was relying on what he perceived to be the intent of the original surveyors, i.e., that the lot line between Government Lots 2 and 3 be "protracted" or "prolongated" or extended in a straight line, from the meander line to the lake.

The trial court was put in a difficult position. We assume, for purposes of this case, that some type of apportionment was appropriate. Given the two choices available, we conclude that the trial court's choice of what was termed the "straight-line" method was reasonable. The choice was reasonable despite the fact that it may not have been the intent of Plaintiff's surveyor to apportion the land in the first place.[16]

The trial court ruled in favor of the "straight-line" method, noting that in the "pie" or "cove"

---

[16]Plaintiff recognized the problems present in the case in his post-trial brief filed with the circuit court. Plaintiff argued that the "straight-line" method employed by his surveyor was the only reasonable way to apportion the reliction since there was "no evidence and no information as to the amount of the original shoreline" and therefore it was "impossible to divide the relicted land on the basis of proportioning the original shoreline to the present shoreline." Plaintiff argued that Defendant surveyor's attempt at equal proportion was plagued by unfounded assumptions necessary to approximate the original shoreline and determine the center of the bay.

method, the determination of the center of the Bay was somewhat arbitrary. The trial court termed such calculation "vague and uncertain." Under the circumstances of this case, the straight-line extension of the division line constituted a reasonable approach to apportioning the relicted land.

## ADVERSE POSSESSION

It is argued by Defendants that the Brekkes possessed the land adversely under the terms of secs. 893.06 and 893.07, Stats. (1971). We conclude that the Brekkes met the conditions sufficiently to establish adverse possession for ten years under color of title as to the property described in the Pieper deed.

Under sec. 893.06, Stats., the first question is whether the land in dispute is included in the description in the adverse possessor's deed. *Buza v. Wojtalewicz,* 48 Wis. 2d 557, 563–564, 180 N.W.2d 556 (1970). As noted, the Brekkes acquired their property in two conveyances. Although the majority of the disputed relicted land which the Brekkes presently occupy was arguably conveyed by one of these deeds, a small portion of the disputed land was arguably conveyed by the second deed. We, therefore, analyze each deed individually.

The first deed is the 1960 Pieper Deed. The metes and bounds description in this deed is as follows:

> "That part of Government Lot Two (2) of Section Six (6), Township Thirty-seven (37) North of Range Twelve (12) West in Washburn County, Wisconsin, described as follows, to-wit: Starting at an iron stake the East one-quarter (1/4) corner of Said Section 6; thence South 3. 47 min., East along the Section line 138.70 feet to a stake; thence

South 33 deg. 47 min. West 564 feet to an iron stake; thence South 43 deg. 19 min. West 432.15 feet to an iron stake; thence North 69 deg. 37 min. West 446.25 feet to an iron stake; thence South 87 deg. 52 min. West 162.50 feet to an iron stake; thence South 87 deg. 52 min. West 66 feet to an iron stake, the point of beginning; thence South 87 deg. 52 min. West 67 feet to an iron stake; thence North 13 deg. 38 min. West 254.30 feet to an iron stake on the lakeshore of Shell Lake; thence North 70 deg. 42 min. East 72 feet to an iron stake; thence South 12 deg. 19 min. East 275 feet to the point of beginning, together with all land lying between the above described premises and the water's edge of Shell Lake."

Plaintiff concedes that the straight-line apportionment used by the trial court would bisect the property conveyed in the foregoing description: "When the government lot line between Government Lots 2 and 3 is extended in a straight line to the water's edge of Shell Lake, a portion of the metes and bounds description contained in the deed lies within Government Lot 2 and a portion extends into Government Lot 3 [as determined by the new reliction apportionment]...."

Plaintiff argues that the prefatory statement in the metes and bounds description, i.e., "That part of Government Lot Two (2)," limits the conveyance to only land within Government Lot 2, and since it has subsequently been determined that the land is part of Government Lot 3, then by definition the disputed land is excluded. This is essentially the line of reasoning adopted by the trial court.

Plaintiff contends that even if the deed is viewed most favorably to the Brekkes, the deed raises an ambiguity, and principles of deed construction hold

that the grantor intends to convey the tract to which he has title and no more. Since the Piepers only owned land in Government Lot 2, the land in question could not have been conveyed.

Plaintiff also argues that upholding the Brekkes' color of title claim would not be consistent with the underlying rationale of the color of title statute. Plaintiff asserts that the legislature created the ten-year statute as a special exception to the general twenty year statute, based on reasons associated with the notice given to the world by one claiming under color of title. Plaintiff argues:

> "The reason for the distinction is obvious. The written document, providing color of title, is written notice to the world of the claimed ownership above and beyond the notice provided by the possession itself. Emphasis has added to this rationale when the legislature amended the law to require that the deed constituting color of title be recorded within thirty days following entry onto the land. *See* sec. 893.26, Stats. 1979."

Plaintiff maintains that the deed gave no notice that the Brekkes were claiming any land in Government Lot 3. Plaintiff states: "It was not possible to determine from the deed itself that Brekke claimed any land owned by Perpignani."

Plaintiff asserts that the present case is similar to and controlled by *Beasley*. Plaintiff stresses that *Beasley* is analogous since it involved the determination of a property division line by the trial court which resulted in a conclusion that Beasley's adverse possession under color of title claim had to fail since the property in dispute was not within the calls of the deed description. Plaintiff argues that the same situa-

tion has occurred in the instant case, and the Brekke's color of title claim must fail.

We conclude that the court of appeals correctly held that the Pieper deed description included land which constitutes the major part of the apportioned reliction and that the Brekkes established color of title as to this land.

Evidence adduced at trial reveals that Colonel W.G. Hoar performed a survey and created a plat, known as the White Grove Plat, in 1959. In creating this plat, Colonel Hoar monumented a portion of Government Lot 2. The Pieper deed's metes and bounds description apparently conforms to the Hoar Plat, Lot No. 1. The Rasmussen deed's, metes and bounds description appears to conform with what would have been Hoar Plat No. 2. The record reveals that the Hoar Plat and Survey was never recorded (although Plaintiff testified that he did find the Hoar Plat Map at the Register of Deeds office).

Plaintiff's argument focuses on the determination by the trial court as to the appropriate manner in which to fix the division line between Lots 2 and 3 in order to equitably apportion the relicted land. Plaintiff treats this determination as if the court were declaring rights which had always existed; Plaintiff attempts to give the line-drawing retrospective effect.

The reliction line produced by the apportionment, which in this case serves as a division line between Government Lots 2 and 3, has no effect on the Brekkes' color of title claim. Such line was not fixed until after the present suit was commenced. Prior to that time, there had been no determination as to the boundary line of Government Lots 2 and 3, north of

the meander line. The Brekkes do not claim owner-ship of land outside the Pieper and Rasmussen convey-ances. We conclude that the Brekkes "entered into possession of [the] premises under claim of title," and found such claim under the Pieper deed, being a written instrument conveying the premises, pursuant to sec. 893.06, Stats. (1971).

The evidence shows that the Rasmussen deed was delivered to the Brekkes in 1972. There is no dispute that the Brekkes did not own the Rasmussen parcel for the requisite statutory period of ten years prior to commencement of the present suit. As to the Rasmus-sen parcel, therefore, we need address the preliminary question of whether adverse possession is available at all.

The only way that the Brekkes may press an adverse possession argument as to the Rasmussen parcel is if the doctrine of "tacking" is held to apply. The court of appeals analyzed the tacking issue in terms of the "color of title" question, stating:

> "The color of title analysis applies to Rasmussen's deed to Brekke. Rasmussen obtained her lot in 1960. Though Brekke obtained Rasmussen's lot in 1972, and Perpignani filed this action in 1980, Brekke still satisfied the 10-year statutory period because he can tack his eight years of possession to Rasmussen's 12 years. *See Mortenson v. Murphy,* 153 Wis. 389, 393, 141 N.W. 273–274, (1913); sec. 893.06, Stats. Similar to the Pieper deed, the description is accurate but for the reference to 'Government Lot Two (2).'" *Perpignani,* 129 Wis. 2d at 486, n. 8.

■

It has long been the law in Wisconsin that an adverse claimant may "tack" or add his time of

possession to that of a prior adverse possession in order to establish a continuous possession for the requisite statutory period. *See, e.g., Allis v. Field,* 89 Wis. 327, 62 N.W. 85 (1895); *Illinois Steel Co. v. Jeka,* 119 Wis. 122, 95 N.W. 97(1903); *Closuit v. John Arpin Lumber Co.,* 130 Wis. 258, 110 N.W. 222 (1907).

The court of appeals correctly cited the *Mortenson* case as support for application of the tacking doctrine to the ten-year, color of title statute. *See, Mortenson,* 153 Wis. at 393. Examination of *Mortenson* and related cases reveals that, in order to benefit from tacking, the adverse claimant must be shown to be in privity with any prior adverse possessor.

In *Illinois Steel v. Paczocha,* 139 Wis. 23, 119 N.W. 550 (1909), this court discussed the privity requirement. The contention that establishing privity was contingent on title was rejected:

> "The question is purely one of physical possession, except for the case of actual subordination to the true owner. If there has been that physical possession, it matters not what nor how varied the claims of the title set up meanwhile, nor indeed the absence of any. The privity between successive occupants required for the statute of limitations is privity merely of that physical possession, and that is not dependent on any claim, or attempted transfer, of any other interest or title in the land." *Id.* at 28.

The privity requirement was further discussed in *Bank of Eagle v. Pentland,* 197 Wis. 40, 221 N.W. 383 (1928) where this court stated:

> "'While it is not necessary, in order to create such privity as will enable a subsequent occupant to tack his possession to that of the prior occupant,

that there should be a conveyance in writing, and although such prior possession may be transferred by parol, yet it must clearly appear that the particular premises ... were in fact embraced in the deed or transfer in whatever form it may have been made.'" *Id.* at 42, quoting, *Ryan v. Schwartz,* 94 Wis. 403, 411, 69 N.W. 178 (1896).

As summarized in *Menzner v. Tracy,* 247 Wis. 245, 252, 19 N.W.2d 257, reh'g. denied, 247 Wis. 245, 19 N.W.2d 869 (1945): "The privity necessary to exist to enable possessory rights to be transferred is merely a succession of relationships to the same thing."

We conclude that there is sufficient privity between the Rasmussens and the Brekkes such that tacking is appropriate. The Rasmussens conveyed Hoar Plat Lot 2 to the Brekkes in the 1972 by warranty deed.[17] The small triangle of land lying west

---

[17]The metes and bounds description in the 1972 Rasmussen deed reads, in pertinent part:

"That part of Government Lot Two (2), Section Six (6), Township Thirty-seven (37) North, Range Twelve (12) West, described as follows:

"Starting at an iron stake, the East 1/4 corner of Section 6; thence South 3 degrees 47 minutes West along the section line 138.70 feet to a stake; thence South 33 degrees 47 minutes West 564 feet to an iron stake; thence South 43 degrees 19 minutes West 432.15 feet to an iron stake; thence North 69 degrees 37 minutes West 446.25 feet to an iron stake; thence North 87 degrees 52 minutes West 162.50 feet to an iron stake, the place of beginning; thence North 10 degrees, 59 minutes West 296.90 feet to an iron stake; thence South 70 degrees 42 minutes West 72 feet to an iron stake; thence South 12 degrees 19 minutes East 275 feet to an iron stake; thence South 87 degrees 52 minutes East 66 feet to the place of beginning, and including all land between the above described premises and the water's edge of Shell Lake."

of the court-determined reliction line is within the calls of the Rasmussen deed description. This section of land was possessed by the Rasmussens. The Rasmussens thus had the same relationship to Plaintiff, as to this parcel of land, as their successors in title, the Brekkes, now have to Plaintiff. This sufficiently establishes privity.

Although the court of appeals dealt with this tacking issue, its treatment was incomplete. In order for an adverse claimant to benefit from the tacking doctrine, it must be shown that the prior possession was, in itself, *adverse.* Thus, in this case, the Brekkes must show not only their adverse possession of the parcel, but adverse possession by the Rasmussens for a combined period of time sufficient to establish a ten-year period of adverse possession. The court of appeals did not separately treat the issue of the Rasmussens' possession. Our review of the record reveals that the evidence does not show continued adverse possession by the Rasmussens for the two year period prior to the transfer to the Brekkes.

The foregoing conclusion means that the Brekkes cannot show adverse possession for the requisite ten year period. The Brekkes bear the burden of showing adverse possession as to the Rasmussen parcel. This burden is a two-fold burden: They must show continual adverse possession by the Rasmussens for at least two years and then continual adverse possession of their own for eight years. This burden has not been met at the first level.

As to the portion of the Rasmussen parcel lying west of the reliction line we conclude, based on the failure to establish adverse possession for the statutory period, that such land is owned by Plaintiff.

We note that adverse possession issues are usually mixed questions of law and fact. The question of whether the facts proven related to the character of possession of the land are sufficient to amount to adverse possession is a question of law. The burden of presenting the facts is, of course, on the adverse claimant. We make no attempt to resolve factual matters related to the Rasmussen land, but merely hold that insufficient facts have been presented for the Brekkes to meet their burden.

Helen Rasmussen did not testify at trial. Testimony related to the Rasmussen parcel was given by Bernt Brekke. Mr. Brekke testified that, at the time he bought the Rasmussen lot, there were no structures on it; that he did erect a garage on it at the time the house was built; that he did not have the Rasmussen or Pieper lots surveyed prior to commencement of the instant suit; that when he purchased the lot, Mr. Rasmussen showed him the property, including the stakes; that Rasmussen had a road on his lot; and that before the Rasmussen lot was purchased Brekke planted a row of trees along the lot line between the Pieper and Rasmussen parcels. The foregoing testimony is insufficient to show that the Rasmussens adversely possessed their land for the two-year period prior to the Brekkes' purchase of the lot.

The next question is: Have the Brekkes established adverse possession as to the disputed land lying within the Pieper deed? Prior to analyzing this question, however, it is necessary to analyze the burden of proof an adverse claimant must bear under the statutes.

Proper treatment of the adverse possession issues raised in this case requires an analysis of the interac-

728

tion between secs. 893.06 and 893.07, Stats., (1971). The court of appeals incorrectly concluded that, once color of title is shown, the burden of proof on the issues of occupation and possession, normally favoring the true owner, shifts to favor the adverse claimant. 129 Wis. 2d at 488.

Adverse possession under color of title was discussed many years ago by Chief Justice Edward G. Ryan in *Pepper v. O'Dowd,* 39 Wis. 538 (1876). In *Pepper,* this Court construed secs. 6 and 7, ch. 138, Stats., 1871, statutes which essentially parallel secs. 893.06 and 893.07, (1971).[18]

---

[18]Sections 6 and 7, ch. 138, Stats., (1871) provide:

"**Limitations of Actions** .... Sec. 6. Whenever it shall appear that the occupant, or those under whom he claims, entered into the possession of any premises under claim of title exclusive of any other right, founding such claim upon some written instrument as being a conveyance of the premises in question, or upon the judgment of some competent court, and that there has been a continual occupation and possession of the premises included in such instrument or judgment, or of some part of such premises, under such claim for ten years, the premises so included shall be deemed to have been held adversely; except that when the premises so included consist of a tract divided into lots, the possession of one lot shall not be deemed the possession of any other lot of the same tract.

"Sec. 7. For the purpose of constituting an adverse possession by any person claiming a title founded upon some written instrument or some judgment, land shall be deemed to have been possessed and occupied in the following cases:—

"1. Where it has been usually cultivated or improved.

"2. Where it has been protected by a substantial enclosure.

"3. Where, although not enclosed, it has been used for the supply of fuel or of fencing timber, for the purpose of husbandry, or the ordinary use of the occupant.

Writing for the court, Chief Justice Ryan stated:

> "The two sections must be considered together as one entire provision; for they are not only *in pari materia,* but are clearly dependent on each other. Sec. 6 gives the general rule of adverse possession under paper title; and sec. 7 defines certain particular conditions of such adverse possession." *Id.* at 543.

The *Pepper* court went on to clarify the intent of the sections:

> "Sec. 6 enacts what was generally recognized as the law before the statute, that when one enters into and holds continual possession, under a paper title, of part of the premises included in it, he shall be deemed to hold adversely all the premises included in it; that is, when one enters under color of title, he is presumed to enter claiming according to the extent of his title ... and where there is no adverse possession, the law will construe his entry to be coextensive with his title ...; 'except that when the premises so included consist of a tract divided into lots, the possession of one lot shall not be deemed the possession of any other lot of the same tract.'" *Id.* at 543–544 (Citations omitted).

The *Pepper* court noted that, prior to the statute, adverse possession, in order to bar the true title, had to be visible and notorious. *Id.* at 544. Since it was visible and notorious, the true owner "was presumed

---

"4. Where a known farm or a single lot has been partly improved, the portion of such farm or lot, that may have been left not cleared or not included according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved or cultivated."

to have notice of it and to acquiesce in it." *Id.* The question arose as to when actual adverse possession, i.e., visible and notorious acts on a piece of land, could be extended by construction to the rest of the premises claimed, on the theory that the visible and notorious acts on part of the property fairly implied notice and acquiescence of adverse claim as to the rest of the property. As noted, in *Pepper*, "[t]he difficulty lay in connecting the actual possession with the extent of the paper title." *Id.* at 544–545.

The *Pepper* court reasoned the presumption that actual possession of part of the premises claimed under one title operated as visible and notorious adverse possession of the whole implied another presumption, i.e., that "the extent of the paper title was as visible and notorious as the actual possession." *Id.* at 545. Noting that in the case involving several distinct lots conveyed under one title adverse possession of one lot may not be fair notice of possession of the others, the court observed:

> "But as possession of part of a single lot may well imply a visible and notorious claim of title and possession to the whole of it, the danger of injustice from the doctrine of constructive adverse possession is greatly lessened, if not wholly removed, by confining it to the single lot within which the actual possession is taken and maintained." *Id.*

The *Pepper* case makes clear the intended relationship between secs. 893.06 and 893.07, Stats., (1971). As provided in sec. 893.06, if a party enters into possession of land under a claim of title, then that party can be awarded those premises through adverse possession if that party can show "continual occupation and possession of the premises" included in the

claim of title *"or of some part of such premises"* for a ten year period.

This section illustrates the "constructive possession" notion discussed in *Pepper*. The statute allows the adverse claimant to claim adverse possession to an entire lot, while perhaps exhibiting visible and notorious ownership on only a portion of that lot. Thus, the adverse claimant benefits from the built-in *presumption* that the true owner had fair notice and acquiesced in the adverse possession of the entire lot and not only in the land on which visible and notorious adverse possession had actually taken place. This is the presumption which is at work in sec. 893.06, Stats.

The court of appeals relied on *Illinois Steel Co. v. Budzisz,* 139 Wis. 281, 119 N.W. 935 (1909) as support for the shifting of presumptions and burdens, normally favoring the true owner, to the adverse claimant. *Illinois Steel* offers no support for such a proposition.

The *Illinois Steel* court explained that, at common law, possession by one not having title in fact was presumed to be in subordination to the legal title. 139 Wis. at 299. Section 4210, Stats., (1898), changed this common law rule. That statute provides:

> **"Presumption for legal title. Section 4210.**
> In every action to recover real property or the possession thereof the person establishing a legal title to the premises shall be presumed to have been possessed thereof within the time required by law, and the occupation of such premises by another person shall be deeded to have been under and in subordination to the legal title unless it appear [sic] that such premises have been held and possessed adversely to such legal title for ten years, under the provisions of the next section, or twenty

732

years under the provisions of section 4213, before the commencement of such action."

The *Illinois Steel* court noted that, under the terms of sec. 4210, if one was in possession of property

"... [f]or the full statutory period, the presumption arises, that it commenced with all the statutory essentials of adverse entry and likewise continued, efficiently extinguishing the original title; such presumption being, of course, one of fact and, as such, rebuttable, yet, of as much dignity in favor of the new apparent owner as the presumption displaced during its life was in favor of the former owner's title, in that it requires evidence to extinguish it of the same probative force as would be required to overturn the former." *Id.* at 299–300.

The foregoing statement in no way changes or shifts the burden a party must bear in seeking ownership of property through adverse possession. The comment by the *Illinois Steel* court only conveyed the notion that the successful adverse claimant, having shown adverse possession for the requisite statutory period, enjoys the same presumption of ownership, as the new owner, that the true owner previously benefitted from. The law of adverse possession is clear that, in assessing the adverse claimant's case, all reasonable presumptions must be made in favor of the true owner. *Allie v. Russo,* 88 Wis. 2d 334, 343, 276 N.W.2d 730 (1979). In stating this rule, this Court has not distinguished between the ten and twenty year statute, and it is clear the presumption applies in all cases involving an adverse possession claim. *See, e.g., Perkins v. Perkins,* 173 Wis. 421, 180 N.W. 334, 181 N.W. 812 (1971); *Illinois Steel Co. v. Budzisz,* 106 Wis. 499,

81 N.W. 2037, 83 N.W. 534 (1900); *Zeisler Corp. v. Pagis,* 24 Wis. 2d 190, 128 N.W.2d 414 (1964).

In the instant case, the Brekkes have shown that they claimed title to land conveyed in the Pieper deed, and claim to have possessed such land since the 1960 deed was signed. As to that portion of land, the question remains whether the Brekkes have shown sufficient continual acts of adverse possession, under sec. 893.07, Stats.

We agree with the court of appeals that the Brekkes have shown sufficient adverse acts for the requisite period. At trial, Bernt Brekke testified to the following facts: 1) He built a driveway into the property shortly after purchasing it in 1960; 2) He put a trailer house on the property during the summer of 1961; 3) He cleared brush from the property; 4) He cleared the front of the lot along the lake; 5) He kept the front part of the yard mowed over to the western boundaries of Hoar Plat Lot 1, boundaries marked by iron stakes; 6) The trailer house remained on the improved property until a house was built on the land two to three years prior to trial; and 7) A row of trees was planted on the line between Hoar Plat Lots 1 and 2.

Plaintiff describes the evidence of adverse possession as "sparse and nonspecific," noting that there are three general items relied on: "construction and use of a driveway, placement and use of a mobile home, and some yard work." Plaintiff asserts that there is no evidence to show that the driveway and mobile home were "actually located on the land being claimed adversely," and these acts therefore may not be relied on to show adverse possession. Plaintiff argues that, given the fact that there is no evidence confirming the location of the mobile home, the driveway, and the

line of trees planted, the only possible evidence remaining is the clearing of the brush. Brush clearing, it is contended, is not sufficient to show adverse possession.

Despite the fact that there is a strong presumption in favor of the true owner, the claimant's burden in an adverse possession case is the lowest burden—to prove adverse possession by the greater weight of credible evidence. *Kruse v. Horlamus Industries,* 130 Wis. 2d 357, 387 N.W.2d 64 (1986).

The testimony revealed that the Brekkes continuously improved and cultivated the Pieper lot from the time of their purchase in 1960, within the meaning of sec. 893.07, Stats., (1971). We conclude that the activities of the Brekkes showed that the physical possession of the property was hostile, open, notorious and continuous for the requisite ten year period. *See, Leciejewski v. Sedlak,* 116 Wis. 2d 629, 636–637, 342 N.W.2d 734 (1984).[19] We agree with the court of

[19]An adverse claimant relying on the color of title ten year statute must prove the character of the possession in the same manner as the claimant relying on the twenty year statute.

"While color of title draws the constructive possession of the whole premises to the actual possession of a part only, and is evidence of the nature of the entry and of the extent and boundaries of the possession claimed, it is not of itself evidence of adverse possession, and it does not necessarily follow that adverse possession can be proved by less evidence when the entity is under color of title than when it is not. *The existence of color of title does not dispense with the necessity for acts of adverse possession."* 3 Am. Jur. 2d *Adverse Possession,* sec. 145 (1986). (Footnotes omitted.) (Emphasis added.)

As stated in *Somon v. Murphy Fabrication & Erection Co.,* 232 S.E.2d 524, 529 (W. Va. 1977), "the office of claim of title or color of

appeals that the trial court failed to consider much of Bernt Brekke's testimony, testimony which is supported or undisputed by Plaintiff. *Perpignani,* 129 Wis. 2d at 490. The testimony supports the conclusion that the Brekkes established adverse possession.

## *VALUE OF PROPERTY*

The trial court had concluded that the entire disputed parcel was owned by Plaintiff. The trial court determined that the land be sold to the Brekkes. The price was set based on testimony from the Plaintiff as to the value of the land. We have concluded that only a portion of the disputed land belongs to Plaintiff. We remand for a determination as to the value of that land.

The trial court concluded that a forced sale of the land was the best solution: "It would not be reasonable to require the defendants to remove their buildings and the more reasonable and equitable remedy would be an award of damages based upon the value thereof and a transfer of title to that land by the plaintiff to the defendants. ..." We agree that a sale of Plaintiff's land to Helen Brekke is the most equitable solution. The complaint in the present case did not rely on any statutory sections in stating the cause of action but merely asked for a declaration of rights. We note that the case may be treated as an action based on

title is to define the area which can be claimed by adverse possession." The character of the possession must still be proven. *See, Cothran v. Akers Motor Lines, Inc.,* 257 N.C. 782, 127 S.E.2d 578, 580 (1962); *see also, Calhoun v. Smith,* 387 So. 2d 821, 823 (Ala. 1980) (Elements of proof for ten and twenty year statutes are similar).

interference with a property interest under ch. 844, Stats. Under this chapter, the court may award the legal or equitable relief to which Plaintiff is entitled. *See,* sec. 844.20, Stats. Courts may apply equitable remedies as necessary to meet the needs of a particular case. *Prince v. Bryant,* 87 Wis. 2d 662, 674, 275 N.W.2d 676 (1979). This court has also stated that the general rule is "that a court may grant such relief as it feels a party is entitled to, even if such relief has not been demanded." *Klaus v. Vander Heyden,* 106 Wis. 2d 353, 359, 316 N.W.2d 664 (1982) (declaratory judgment action).

We note that the only evidence relied on by the trial court in assessing value was Plaintiff's testimony. In its memorandum opinion, the trial court stated: "The testimony was that based upon Plaintiff's sale of one lot and his independent investigation as to the selling price, it was his opinion that lakeshore property has a fair market value on Shell Lake of $250 a front foot."

The general rule in Wisconsin is that a non-expert owner of property may testify concerning the value of that property, whether it is personal or real property. *Trible v. Tower Ins. Co.,* 43 Wis. 2d 172, 187, 168 N.W.2d 148 (1969). *See also, Wilberscheid v. Wilberscheid,* 77 Wis. 2d 40, 48, 252 N.W.2d 76 (1977). "The weight to be given a non-expert owner's testimony is for the trier of facts." *Trible,* 43 Wis. 2d at 187.

Plaintiff should be given the fair market value for his land. Fair market value has been defined as "the price arrived at between a willing but not obligated buyer and seller." *Schwalbach v. Antigo Electric & Gas, Inc.,* 27 Wis. 2d 651, 661, 135 N.W.2d 263 (1965).

The trial court's determination of the value of land involved the exercise of discretion. This court will sustain a discretionary act if it can be concluded that the trial court examined the relevant facts, applied the proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *Loy v. Bunderson,* 107 Wis. 2d 400, 414–415, 320 N.W.2d 175 (1982). Though it was reasonable to allow the introduction of Plaintiff's testimony as to the value of his land, reliance solely on that testimony was unreasonable. Given the unique shape of the triangle lot which we have determined Plaintiff owns, i.e., the lot has a fair amount of lake frontage but a minimal depth, it would be inappropriate to rely on a value figured in terms of lake frontage.

The determination of a sale figure is analogous to a damage award. This court has stated: "In reviewing damage awards granted in either a bench or jury trial this court does not substitute its judgment for that of the fact finder, but rather determines whether the award is within reasonable limits." *Cords v. Anderson,* 80 Wis. 2d 525, 552–553, 259 N.W.2d 672 (1977). Reasonable and reliable assessment of damages involving property often requires expert testimony.

Experts testifying as to the value of property should base their opinions on comparable sales, if those sales exist. *Bear v. Kenosha County,* 22 Wis. 2d 92, 100, 125 N.W.2d 375 (1963). The "comparable sales" method is also employed in eminent domain proceedings, a context quite similar to the present case. *See, Herro v. Dept. of Natural Resources,* 67 Wis. 2d 407, 227 N.W.2d 456 (1975); *see also,* sec. 32.09, Stats. On remand, the trial court is directed to take

further evidence related to valuation of the property which we have concluded is owned by Plaintiff.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and the cause remanded to the circuit court for further proceedings consistent with this opinion.